*PRELIMINARY PRINT*

## VOLUME 604 U. S. PART 1
### PAGES 334–368

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MARCH 4, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.  Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA *v.* ENVIRONMENTAL PROTECTION AGENCY

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 23–753.   Argued October 16, 2024—Decided March 4, 2025

Under the Clean Water Act (CWA), 33 U. S. C. § 1251 *et seq.*, the Environmental Protection Agency (EPA) and authorized state agencies issue permits that impose requirements on entities that wish to discharge "pollutants" into the waters of the United States.   A critical component of the CWA regulatory scheme is the National Pollutant Discharge Elimination System (NPDES), which makes it unlawful to discharge pollutants into covered bodies of water unless authorized by permit. *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 205.   These permits typically include "effluent limitations" on discharges that restrict the "quantities, rates, and concentrations of chemical, physical, biological, and other constituents."   § 1362(11).   Failure to comply with permit limitations exposes permittees to civil penalties and even criminal prosecution.   §§ 1319(c) and (d).   Under what is known as the "permit shield" provision, however, an entity that adheres to the terms of its permit is deemed to be compliant with the Act.   § 1342(k).

This case involves a challenge to "end-result" requirements—permit provisions that do not spell out what a permittee must do or refrain from doing but instead make a permittee responsible for the quality of the water in the body of water into which the permittee discharges pollutants.   The City of San Francisco operates two combined wastewater treatment facilities that process both wastewater and stormwater.   Combined Sewer Overflow (CSO) Control Policy, 59 Fed. Reg. 18689; 75 F. 4th 1074, 1082 (CA9).   During periods of heavy precipitation, the combination of wastewater and stormwater may exceed the facility's capacity, and the result may be the discharge of untreated water, including raw sewage, into the Pacific Ocean or the San Francisco Bay.   59 Fed. Reg. 18689; EPA, Office of Water, Combined Sewer Overflows: Guidance for Permit Writers, p. 1–1; 75 F. 4th, at 1082–1083.   In 1994, the EPA adopted its CSO Control Policy, which requires municipalities with combined systems to take prescribed measures and to develop and implement a Long-Term Control Plan, and provides for a two-phase permitting process.   59 Fed. Reg. 18691, 18696.

For many years, San Francisco's NPDES permit for its Oceanside facility was renewed without controversy, but in 2019, the EPA issued a renewal permit that added two end-result requirements. 75 F. 4th, at 1084–1085. The first of these prohibits the facility from making any discharge that "contribute[s] to a violation of any applicable water quality standard" for receiving waters. *Id.*, at 1085. The second provides that the City cannot perform any treatment or make any discharge that "create[s] pollution, contamination, or nuisance as defined by California Water Code section 13050." *Ibid.* (internal quotation marks omitted). San Francisco argued that the end-result requirements exceed the EPA's statutory authority, but the Ninth Circuit denied the City's petition for review. The court held that § 1311(b)(1)(C) authorizes the EPA to impose "any" limitations ensuring applicable water quality standards are satisfied in a receiving body of water.

*Held*: Section 1311(b)(1)(C) does not authorize the EPA to include "end-result" provisions in NPDES permits. Determining what steps a permittee must take to ensure that water quality standards are met is the EPA's responsibility, and Congress has given it the tools needed to make that determination. Pp. 344–355.

(a) Not all "limitations" under § 1311 must qualify as effluent limitations. While §§ 1311(b)(1)(A) and (B) refer to "effluent limitations," § 1311(b)(1)(C) refers to "any more stringent limitation." This distinction shows that Congress intentionally authorized limitations beyond effluent limitations because "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of language in a statute. *Russello* v. *United States*, 464 U. S. 16, 23 (internal quotation marks omitted). Other CWA provisions support this by referring to "effluent limitations and other limitations" under § 1311. See, *e.g.*, §§ 1341(d), 1365(f). Moreover, San Francisco's interpretation would either invalidate widely accepted narrative permit provisions or require an improbably broad reading of "effluent limitation." Pp. 344–345.

(b) Section 1311(b)(1)(C) does not authorize permit requirements conditioning compliance on receiving water quality. The provision's text, structure, and context support this interpretation. Pp. 345–355.

(1) The terms "limitation," "implement," and "meet" in § 1311(b)(1)(C) suggest the EPA must set specific rules permittees must follow to achieve water quality goals. A "limitation" is a "restriction . . . imposed from without," not an end-result requirement leaving permittees to determine necessary steps. Webster's Third New International Dictionary 1312. When a provision tells a permittee that a particular end result must be achieved, the direct source of the restriction comes from

within, not "from without."   To "implement" standards requires "concrete measures," not simply mandating achievement of results.   *Id.*, at 1134; § 1311(b)(1)(C).   A limitation that is "necessary to meet" an objective is most naturally understood to mean a provision that sets out actions that must be taken to achieve the objective.   Pp. 346–348.

(2) The pre-1972 Water Pollution Control Act (WPCA) contained a provision that allowed direct enforcement against a polluter if the quality of the water into which the polluter discharges pollutants failed to meet water quality standards.   See Federal Water Pollution Control Act, ch. 758, §§ 1, 2(d)(1), 2(d)(4), 2(d)(7), 62 Stat. 1155, 1156–1157.   But Congress deliberately omitted such provisions when overhauling the law in 1972.   Instead, the CWA imposes "direct restrictions" on polluters rather than working backward from pollution to assign responsibility.   *EPA*, 426 U. S., at 204.   The Government's interpretation would undo what Congress plainly sought to achieve when it scrapped the WPCA's backward-looking approach.   Pp. 348–349.

(3) Two features of the broader statutory scheme further support this conclusion.   First, end-result requirements would negate the CWA's "permit shield" protecting compliant permittees from liability.   Second, EPA's interpretation provides no mechanism for fairly allocating responsibility among multiple dischargers contributing to water quality violations.   Pp. 350–352.

(c) The Agency has adequate tools to obtain needed information from permittees without resorting to end-result requirements.   Its reliance on the Combined Sewer Overflow Policy is misplaced as that policy authorizes narrative limitations but not end-result requirements.   And concerns about disrupting general permits are unfounded given that narrative limitations remain available.   Pp. 352–355.

75 F. 4th 1074, reversed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS and KAVANAUGH, JJ., joined, in which GORSUCH, J., joined as to all but Part II, and in which SOTOMAYOR, KAGAN, BARRETT, and JACKSON, JJ., joined as to Part II.   BARRETT, J., filed an opinion dissenting in part, in which SOTOMAYOR, KAGAN, and JACKSON, JJ., joined, *post*, p. 356.

*Tara M. Steeley* argued the cause for petitioner.   With her on the briefs were *David Chiu, Yvonne R. Meré, David S. Louk, John S. Roddy, Estie M. Kus, Andrew C. Silton, John C. Cruden,* and *Richard S. Davis.*

*Frederick Liu* argued the cause for respondent.   With him on the brief were *Solicitor General Prelogar, Assistant*

Opinion of the Court

*Attorney General Kim*, *Deputy Solicitor General Stewart*, *Meghan E. Greenfield*, and *Steven M. Neugeboren.**

JUSTICE ALITO delivered the opinion of the Court.

Under the Clean Water Act (CWA), 86 Stat. 816, 33 U. S. C. § 1251 *et seq.*, the Environmental Protection Agency (EPA) and authorized state agencies[1] may issue permits that im-

*Briefs of *amici curiae* urging reversal were filed for the Hayden Area Regional Sewer Board by *Preston N. Carter* and *Morgan D. Goodin*; for the Local Government Legal Center et al. by *J. G. Andre Monette* and *Amanda Karras*; for the National Association of Home Builders et al. by *John A. Sheehan*, *Thomas Ward*, and *Prianka Sharma*; for the National Mining Association et al. by *Misha Tseytlin*, *Michael A. Tilghman II*, *Ellen Steen*, *Travis Cushman*, *Andrew R. Varcoe*, *Stephanie A. Maloney*, *Michael C. Formica*, and *Elizabeth Milito*; and for Public Wastewater and Stormwater Agencies et al. by *David Y. Chung*, *Elizabeth B. Dawson*, *Amanda E. Aspatore*, *Hilary Meltzer*, *F. Paul Calamita III*, and *Melissa A. Thorme*.

Briefs of *amici curiae* urging affirmance were filed for the State of California by *Rob Bonta*, Attorney General of California, *Michael J. Mongan*, Solicitor General, *Christopher D. Hu*, Deputy Solicitor General, *Tracy L. Winsor*, Senior Assistant Attorney General, *Russell B. Hildreth*, Supervising Deputy Attorney General, and *Marc N. Melnick* and *Bryant B. Cannon*, Deputy Attorneys General; for the State of Washington et al. by *Robert W. Ferguson*, Attorney General of Washington, *Kelly T. Wood*, and *Peter B. Gonick*, Deputy Solicitor General, by *Andrea Joy Campbell*, Attorney General of Massachusetts, and *Helen Yurchenco* and *Emily Mitchell Field*, Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *William Tong* of Connecticut, *Brian L. Schwalb* of the District of Columbia, *Kwame Raoul* of Illinois, *Aaron Frey* of Maine, *Anthony G. Brown* of Maryland, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Matthew Platkin* of New Jersey, *Ellen F. Rosenblum* of Oregon, *Michelle A. Henry* of Pennsylvania, and *Josh Kaul* of Wisconsin; for Environmental and Community Organizations by *Kirti Datla*, *Benjamin Chagnon*, and *Linnet Davis-Stermitz*; for the Orange County Coastkeeper by *Sarah J. Spinuzzi*; and for Small Business Owners and Operators by *Keith P. Richard.*

[1] See 33 U. S. C. § 1342(b). The provision at issue in this case, § 1311(b)(1)(C), applies equally to federal and state permits, but for convenience, we refer only to the EPA when referring to the scope of permitting authority under that provision.

pose requirements on entities that wish to discharge "pollut-
ants" (a broadly defined term)[2] into the waters of the United
States.[3]   Permits issued by these agencies include what the
CWA calls "effluent limitations," that is, provisions that
specify the quantities of enumerated pollutants that may be
discharged.[4]   It is also common for permits to set out other
steps that a discharger must take.   These may include test-
ing, record-keeping, and reporting requirements, as well as
requirements obligating a permittee to follow specified prac-
tices designed to reduce pollution.   None of these so-called
narrative requirements is at issue here.

Instead, this case involves provisions that do not spell out
what a permittee must do or refrain from doing; rather, they
make a permittee responsible for the quality of the water
in the body of water into which the permittee discharges
pollutants.   When a permit contains such requirements, a
permittee that punctiliously follows every specific require-
ment in its permit may nevertheless face crushing penalties
if the quality of the water in its receiving waters falls below
the applicable standards.   For convenience, we will call such
provisions "end-result" requirements.

The permittee in this case is a wastewater treatment facil-
ity owned by San Francisco.   For the past five years, the
facility's permit has included two end-result requirements,
and if those provisions are upheld, the City could be heavily
penalized even though it was never put on notice that it was
obligated to take any specific step other than those it under-
took.   San Francisco argues that the end-result provisions
in its permit are not authorized by the CWA, and its position
is supported by many other similarly situated cities, includ-
ing New York, the District of Columbia, Boston, and Buffalo,
as well as national and state associations whose members

---

[2] § 1362(6).
[3] § 1362(7).
[4] § 1362(11).

collectively "provide wastewater and stormwater services to the majority of [the people in this country whose homes are connected to sewers]."[5]

We hold that the two challenged provisions exceed the EPA's authority.  The text and structure of the CWA, as well as the history of federal water pollution legislation, make this clear.  And resorting to such requirements is not necessary to protect water quality.  The EPA may itself determine what a facility should do to protect water quality, and the Agency has ample tools to obtain whatever information it needs to make that determination.  If the EPA does its work, our holding should have no adverse effect on water quality.

I

A

To understand the issue before us, it is helpful to take a brief look back at the history of federal water pollution legislation. For most of the Nation's history, the Federal Government played a secondary role in this field.  See *Sackett* v. *EPA*, 598 U. S. 651, 659 (2023).   In 1948, however, Congress passed the Federal Water Pollution Control Act (WPCA), ch. 758, 62 Stat. 1155, which represented a cautious expansion of federal authority.  K. Murchison, Learning From More Than Five-and-a-Half Decades of Federal Water Pollution Control Legislation: Twenty Lessons for the Future, 32 Boston College Env. Aff. L. Rev. 527, 530–531 (2005).  The WPCA reaffirmed the long-accepted principle that "controlling water pollution" was primarily a state responsibility, but it also declared that the pollution of certain interstate waters had become "a public nuisance" and was "subject to abatement" in a suit brought by the Attorney General on behalf of the United States.  §§ 1, 2(d)(1), 2(d)(4), 2(d)(7), 62 Stat. 1155–1157.

---

[5] Brief for Public Wastewater and Stormwater Agencies et al. as *Amici Curiae* 2.

Over the next 24 years, the WPCA was amended numerous times,[6] and the federal role gradually grew, but the basic structure of federal enforcement actions remained the same. The starting point was the identification of a body of water with substandard water quality. After that, federal authorities had to work backward and prove that a particular entity should be held responsible for the problem.[7] Both the original version of the 1948 Act and all amendments enacted before 1972 proved to be ineffective due in part to this backward-looking model. See *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 202 (1976).

By 1972, the WPCA's inadequacy was apparent, and Congress made a fresh start. It amended the WPCA by deleting all its provisions and substituting what is now generally known as the Clean Water Act. The CWA jettisoned the WPCA's retrospective approach and aimed directly at the sources of pollution. A critical component of the CWA scheme is the National Pollutant Discharge Elimination System (NPDES), see *id.*, at 204–205, which makes it unlawful to discharge pollutants into covered bodies of water unless authorized by permit. Permits issued under this program may contain several different types of provisions.

Some are known as "effluent limitations," see 33 U. S. C. § 1311, which are defined as restrictions on the "quantities, rates, and concentrations of chemical, physical, biological, and other constituents." § 1362(11). Section 1311(b)(1), subparagraphs (A) and (B), require compliance with one type of effluent limitations: those that are based on what can be achieved using specified pollution-treatment technologies.

---

[6] See Water Pollution Control Act Amendments of 1956, Pub. L. 84–660, 70 Stat. 498; Federal Water Pollution Control Act Amendments of 1961, Pub. L. 87–88, 75 Stat. 204; Water Quality Act of 1965, Pub. L. 89–234, 79 Stat. 903; Water Quality Improvement Act of 1970, Pub. L. 91–224, 84 Stat. 91.

[7] See § 2(d), 62 Stat. 1156–1157; 70 Stat. 504–505; 75 Stat. 208–209; 79 Stat. 909.

See 40 CFR § 122.44(a)(1) (2023). In most cases, these technology-based limitations are sufficient, but when they are not, NPDES permits also include water quality-based effluent limitations (WQBELs). 33 U. S. C. § 1311(b)(1)(C). These WQBELs, unlike technology-based effluent limitations, are "set without regard to cost or technology availability." *Natural Resources Defense Council* v. *EPA*, 808 F. 3d 556, 565 (CA2 2015); see *Natural Resources Defense Council, Inc.* v. *EPA*, 859 F. 2d 156, 208 (CADC 1988) (*per curiam*). Instead, they permit only those discharges that may be made without unduly impairing water quality.

In addition to these effluent limitations, it is common for permits to include requirements that do not set numerical limitations on allowed discharges. One example, which is apparently common in so-called general permits, is a provision demanding that permittees follow certain "best practices" that aim to limit pollution.[8]

Under the NPDES system, permittees have a very strong incentive to comply with all permit terms. For one thing, the CWA gives the EPA a very big "stick." Permittees that do not comply may be hit with enormous civil penalties and may face criminal prosecution for "knowing" or even "negligent" violations. See §§ 1319(c) and (d); 40 CFR § 19.4 (2023). At the same time, the CWA holds out an enticing "carrot." Under what is known as the "permit shield" provision, an entity that adheres to the terms of its permit is deemed to be compliant with the Act. See 33 U. S. C. § 1342(k).

B

The case now before us involves a particular type of public wastewater treatment, one that processes both wastewater (water that has been used in a home) and stormwater (rainwater that does not sink into the ground). Many major

---

[8] See Brief for National Association of Home Builders et al. as *Amici Curiae* 1, 11–12.

cities have such systems, and they present special problems. During periods of heavy precipitation, the combination of wastewater and stormwater may exceed the facility's treatment capacity, and the result may be the discharge of untreated water, including raw sewage. See Combined Sewer Overflow (CSO) Control Policy, 59 Fed. Reg. 18689 (1994); EPA, Office of Water, Combined Sewer Overflows: Guidance for Permit Writers, p. 1–1 (1995). This problematic feature of combined facilities was recognized long ago; installing a new system that handles stormwater and wastewater separately is enormously expensive.[9]

To address the problem of CSOs, the EPA adopted its CSO Control Policy, which requires municipalities with combined systems to take prescribed measures and to develop and implement a Long-Term Control Plan. 59 Fed. Reg. 18691. The CSO Policy provides for a two-phase permitting process. *Id.*, at 18696. During phase I, permits require municipalities to implement nine minimum controls and to develop a long-term plan. Then, during phase II, that plan must be implemented. *Ibid.* In 2000, Congress amended the CWA and gave the CSO Control Policy the force of a statute. See 33 U. S. C. § 1342(q)(1).

C

The City of San Francisco operates two combined treatment facilities: the Bayside facility, which discharges into San Francisco Bay, and the Oceanside facility, which empties into the Pacific Ocean. The permit at issue in this dispute concerns only the Oceanside facility,[10] which treats water from 250 miles of sewers and serves approximately 250,000 residents. 75 F. 4th 1074, 1082 (CA9 2023).

For many years, the Oceanside facility's NPDES permit was renewed without controversy, but in 2019, the two end-

---

[9] T. Camp, The Problem of Separation in Planning Sewer Systems, 38 J. Water Pollution Control Federation 1959 (1966).

[10] See App. to Pet. for Cert. 80–140.

result requirements that San Francisco now challenges were added. *Id.*, at 1084–1085. The first of these prohibits the facility from making any discharge that "contribute[s] to a violation of any applicable water quality standard" for receiving waters. *Id.*, at 1085. The second provides that the City cannot perform any treatment or make any discharge that "create[s] pollution, contamination, or nuisance as defined by California Water Code section 13050." *Ibid.* (internal quotation marks omitted).

The California Regional Water Quality Control Board for the San Francisco Bay Region approved the final Oceanside NPDES permit, and the EPA did the same.[11] *Id.*, at 1088. San Francisco appealed to the EPA's Environmental Appeals Board (EAB), objecting to, among other things, the two new provisions just noted. *City and Cty. of San Francisco*, 18 E. A. D. 322, 325 (2020). The EAB rejected San Francisco's challenge, and the City then filed a petition for review in the Ninth Circuit under 33 U. S. C. § 1369(b)(1)(F). 75 F. 4th, at 1088. A divided Ninth Circuit panel denied that petition, holding that § 1311(b)(1)(C) authorizes the EPA to impose "any" limitations that seek to ensure that applicable water quality standards are satisfied in a receiving body of water. *Id.*, at 1089–1090. In dissent, Judge Collins argued that the CWA "draws an explicit distinction between the 'limitations' that the agency must devise and impose on a particular permittee's discharges" and the water quality standards themselves. *Id.*, at 1102 (Collins, J., dissenting). The majority, he maintained, erred by making the "'water quality standards' themselves the applicable 'limitation' for an individual discharger." *Ibid.*

We granted certiorari to decide whether the EPA can impose requirements like those at issue. 602 U. S. 1002 (2024).

---

[11] Both the California Regional Water Quality Control Board and the EPA had to approve the NPDES permit because the Oceanside facility discharges into waters that fall under both state and federal jurisdiction. 75 F. 4th 1074, 1082 (CA9 2023) (case below).

Opinion of the Court

## II

Contending that the Ninth Circuit misread § 1311(b)(1)(C), San Francisco leads with the argument that all "limitations" imposed under § 1311 must qualify as effluent limitations. The statutory text dooms this broad argument. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U. S. 16, 23 (1983) (internal quotation marks omitted). We have invoked this canon time and time again. See, *e. g.*, *Gallardo* v. *Marstiller*, 596 U. S. 420, 429–430 (2022); *Salinas* v. *Railroad Retirement Bd.*, 592 U. S. 188, 196 (2021); *Azar* v. *Allina Health Services*, 587 U. S. 566, 576–577 (2019). And it is fatal to San Francisco's argument here. Sections 1311(b)(1)(A) and (B) refer to "effluent limitations," but the very next provision, § 1311(b)(1)(C), refers instead to "any more stringent limitation." We cannot believe that Congress omitted the term "effluent" from § 1311(b)(1)(C) simply because it wanted to save ink or assumed that regulators and interested parties would understand that the omission of the term was inconsequential.

Other provisions of the CWA support this conclusion by describing § 1311 as authorizing the EPA to impose effluent *or other* limitations. See § 1341(d) (referring to "effluent limitations and other limitations, under section 1311"); § 1365(f) (referring to "effluent limitation[s] or other limitation[s] under section 1311"); § 1367(d) (same); see also *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. 109, 122 (2018) (interpreting the phrase "effluent limitation or other limitation" in the CWA's judicial review provision, § 1369, to encompass both "effluent" limitations and limitations such as "non-numerical operational practice[s]" and "equipment specification[s]").

These reasons convince us that San Francisco's argument is wrong, but if more were needed, it is telling that the City's

interpretation would lead to either drastic consequences that the City is unwilling to embrace or a very loose interpretation of the term "effluent limitation" that would undermine the City's argument. As noted earlier, it is common for permits to contain "narrative" provisions requiring permittees to do such things as following certain "best practices." These provisions do not directly restrict the "quantities, rates, or concentration" of pollutants that a permittee may discharge, and therefore they do not fit easily within the definition of an "effluent limitation." Nevertheless, the City acknowledges their legitimacy, see Brief for Petitioner 15, 33, n. 22, and if that is correct, it must follow either that (1) §1311(b)(1)(C) authorizes the imposition of limitations other than effluent limitations (which would, of course, defeat the City's argument) or (2) the statutory definition of an effluent limitation should be read very loosely (which raises the question why this broad interpretation would not encompass the provisions at issue here). Under either alternative, the City is on perilous ground.

These problems overwhelm any help that the City can derive from the fact that §1311 is titled "Effluent limitations." The title of a statutory provision can inform its interpretation, but it is not conclusive. See *Dubin* v. *United States*, 599 U. S. 110, 120–121 (2023). And here, the title of §1311 is not enough to win the day for the City. Section 1311 is a lengthy provision, and most of its subsections concern effluent limitations. The title "Effluent limitations" provides a rough description of the provision's general sweep, but it cannot be read as doing more than that.

III

In addition to the broad argument discussed above, San Francisco advances a narrower alternative, namely, that even if §1311(b)(1)(C) is not limited to effluent limitations, it "does not authorize EPA to impose NPDES permit requirements that condition permitholders' compliance on whether

receiving waters meet applicable water quality standards."
Brief for Petitioner 19.   We agree with this argument.   As
the City maintains, "[t]he text, structure, and pre- and post-
enactment context" support this interpretation.   *Ibid.*

A

We begin with the text of § 1311(b)(1)(C), which, as noted,
requires a permit to contain, in addition to "effluent limita-
tions," "any more stringent *limitation*" that is "necessary to
*meet*" certain "water quality standards" that are imposed
under state law "or any other Federal law or regulation";
and "any more stringent *limitation*" that is "required to *im-
plement* any applicable water quality standard established
pursuant to this chapter."   (Emphasis added.)   All the itali-
cized terms in the preceding sentence suggest that the most
natural reading of § 1311(b)(1)(C) is that it authorizes the
EPA to set rules that a permittee must follow in order to
achieve a desired result, namely, a certain degree of water
quality.

We start with the term "limitation."   As used in the rele-
vant context, a limitation is a "restriction or restraint im-
posed *from without* (as by law[ )]."   Webster's Third New
International Dictionary 1312 (1976) (emphasis added).   A
provision that tells a permittee that it must do certain spe-
cific things plainly qualifies as a limitation.   Such a provision
imposes a restriction "from without."   But when a provision
simply tells a permittee that a particular end result must be
achieved and that it is up to the permittee to figure out what
it should do, the direct source of restriction or restraint is
the plan that the permittee imposes on itself for the purpose
of avoiding future liability.   In other words, the direct
source of the restriction comes from within, not "from
without."

We do not dispute that the term "limitation" is sometimes
used in a looser sense, but our task is to ascertain what the
term means in the specific context in question.   And here,

our interpretation of the meaning of the term "limitation" in
§ 1311(b)(1)(C) must take into account the way in which the
term is used in the two preceding statutory subsections,
§§ 1311(b)(1)(A) and (B). In both those provisions, the "limi-
tations" are imposed directly by the EPA, and it is therefore
natural to presume that the term has a similar meaning in
§ 1311(b)(1)(C). See, *e. g.*, *McDonnell* v. *United States*, 579
U. S. 550, 568–569 (2016); *Yates* v. *United States*, 574 U. S.
528, 544 (2015) (plurality opinion); A. Scalia & B. Garner,
Reading Law 195–198 (2012). So the use of the term "limi-
tation" in §§ 1311(b)(1)(A) and (B) provides an opening clue
that the EPA's interpretation of § 1311(b)(1)(C) may be
wrong.

The terms "implement" and "meet" point in the same di-
rection. The implementation of an objective generally re-
fers to the taking of actions that are designed "to give prac-
tical effect to and ensure of actual fulfillment by concrete
measures." Webster's Third New International Dictionary,
at 1134. Section 1311(b)(1)(C) tells the EPA to impose re-
quirements to "implement" water quality standards—that is,
to "ensure" "by concrete measures" that they are "actual[ly]"
"fulfill[ed]." Simply telling a permittee to ensure that the
end result is reached is not a "concrete plan" for achieving
the desired result. Such a directive simply states the de-
sired result; it does not implement that result.

Section 1311(b)(1)(C)'s other directive—that the EPA im-
pose limitations that are "necessary to meet" certain water
quality standards–is similar. The verb to "meet," in the
sense operative here, means "to comply with; fulfill; satisfy"
or "to come into conformity with." Random House Un-
abridged Dictionary 1195 (2d ed. 1987). Thus, a limitation
that is "necessary to meet" an objective is most naturally
understood to mean a provision that sets out actions that
must be taken to achieve the objective.

In assessing what the directives in § 1131(b)(1)(C) mean, it
is helpful to consider the use of the relevant terms in every-

day speech. Suppose a State requires that all schools "meet" certain standards of math proficiency, and suppose the principal of a school calls a faculty meeting and instructs the teachers to "implement" those standards. The principal's obvious expectation would be that the teachers would devise and "implement" a plan to make sure that the desired end is "met." It is unlikely that the principal would be happy if the teachers simply told their students that a state math proficiency test would be administered and that they should make sure they passed. That would not constitute the *implementation* of the desired end, *i. e.*, *meeting* the State's standard of math proficiency.

Attempting to counter this interpretation, the EPA stresses § 1311(b)(1)(C)'s use of the term "any" in the phrase "any more stringent limitation," arguing that "any" is a very broad term. That argument misconstrues the term's effect. The adjective "any" is indeed a broad term, but it cannot expand the reach of the noun it modifies. A reference to "any mammal" would capture all mammals, but it would not encompass a bird or fish. Similarly, § 1311(b)(1)(C) encompasses any *limitation* that is necessary to meet or implement water quality standards, but not provisions that do not fall within that category.

B

The text of the CWA militates against the Government's interpretation of § 1311(b)(1)(C) for yet another reason that stands out when the history of federal water pollution control legislation is kept in mind. Under the Government's reading, a permittee may be held liable if the quality of the water into which it discharges pollutants fails to meet water quality standards. Before 1972, the WPCA contained a provision that did exactly that in no uncertain terms. But when Congress overhauled the WPCA in 1972, it scrapped that provision and did not include in the new version of the Act anything remotely similar. Under these circumstances, the absence of a comparable provision in the CWA is telling.

Opinion of the Court

This glaring void resulted from a deliberate and prominent policy choice. As recounted earlier, before 1972, the basic structure of federal enforcement efforts was a lawsuit seeking to hold a polluter accountable for contributing to what amounted to or was expressly termed a violation of water quality standards. Building on the enforcement model originally adopted in the 1948 Act, the 1965 amendments of the WPCA required the adoption of "water quality standards," and they then provided that "violators" of these standards were subject to suit by the United States. 79 Stat. 907–909. That is where matters stood until 1972 when Congress again amended the WPCA by deleting its entire text and substituting what is now popularly called the CWA.

This overhaul of the WPCA continued to require the adoption of water standards, 33 U. S. C. § 1313, but the revised statutory text conspicuously omitted any provision authorizing either the United States or any other party to bring suit against an entity whose discharges were contributing to a violation of those standards.

This omission cannot be viewed as accidental or inconsequential. The repealed enforcement provision went to the heart of what Congress viewed as a major defect in the old scheme. As we have noted, the 1972 overhaul aimed to facilitate enforcement by "making it unnecessary to work backward from an overpolluted body of water to determine which point sources [were] responsible" and thus subject to suit. *EPA* v. *California*, 426 U. S., at 204. Instead, the amended WPCA sought to achieve "acceptable quality standards" by means of "direct restrictions" on polluters. *Ibid.* The Government's interpretation would undo what Congress plainly sought to achieve when it scrapped the WPCA's backward-looking approach.[12]

---

[12] The dissent suggests that the 1972 Congress was displeased with the prior enforcement regime because it was too burdensome for the Government, not because it was unfair for entities against which enforcement actions were brought. See *post,* at 363–364 (BARRETT, J., dissenting

### C

It is a " 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 320 (2014) (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000)). Thus, in construing § 1311, we must also take into account the broader statutory scheme, and at least two features of that scheme point in favor of our interpretation.

### 1

The first is the so-called "permit shield" provision, 33 U. S. C. § 1342(k), under which a permittee is deemed to be in compliance with the CWA if it follows all the terms in its permit. This protection is very valuable because violations of the CWA, even if entirely inadvertent, are subject to hefty penalties. The CWA imposes a regime of strict civil liability, see, *e. g., United States* v. *Allegheny Ludlum Corp.*, 366 F. 3d 164, 174 (CA3 2004), and a party that violates a permit term may be fined up to $25,000 per day per violation, § 1319(d). As San Francisco explains, it may take months to gather the information necessary to detect a drop below the applicable water quality standards, see Tr. of Oral Arg. 16, and after substandard water quality is detected, it may take some time to devise and implement appropriate corrective measures. Indeed, there may be occasions (such as the multiple-discharger situation we discuss below, see *infra*, at 351–352), when there is nothing a permittee can do to bring about a prompt correction. For these reasons, the potential civil penalties for noncompliance can mount up and

---

in part). But whether or not this assessment of Congress's intent is correct, what matters for present purposes is that Congress deliberately deleted a longstanding provision that expressly authorized what the dissent wishes to perpetuate. The idea that Congress sought to preserve the old enforcement mechanism by squirreling it away in § 1311(b)(1)(C)'s inapt language defies belief.

reach enormous sums. In a pending suit against San Francisco regarding the Bayside facility, the penalties sought are $10 billion. See Tr. of Oral Arg. 102. In addition to all this, a permittee who is found to have acted "knowingly" or even "negligently" may be criminally prosecuted. § 1319(c).

Because of the harsh penalties for violating the terms of a permit, the permit shield is invaluable. Because of it, a discharger that complies with all permit conditions can rest assured that it will not be penalized. But the benefit of this provision would be eviscerated if the EPA could impose a permit provision making the permittee responsible for any drop in water quality below the accepted standard. A permittee could do everything required by all the other permit terms. It could devise a careful plan for protecting water quality, and it could diligently implement that plan. But if, in the end, the quality of the water in its receiving waters dropped below the applicable water quality levels, it would face dire potential consequences. It is therefore exceedingly hard to reconcile the Government's interpretation of § 1311(b)(1)(C) with the permit shield. And contrary to the Government's contention, the possibility that a court might ultimately exercise its "broad discretion" to mitigate penalties, see Brief for Respondent 44 (internal quotation marks omitted), is not enough to make up for disarming the shield.

2

One final structural feature cements the case against the EPA's interpretation: the absence of any provision dealing with the problem that arises when more than one permittee discharges into a body of water with substandard water quality. As previously explained, it is hard to believe that the 1972 Congress used § 1311(b)(1)(C) to perpetuate (in camouflaged form) the backward-looking enforcement scheme in the prior version of the WPCA. And it is even harder to accept the proposition that Congress did that without setting out any method for dealing with the multiple-discharger prob-

lem. "[T]here may be dozens or even hundreds of . . . permitted and unpermitted discharges into the same water-body." Brief for National Mining Association et al. as *Amici Curiae* 9. In such situations, the pre-1972 enforcement scheme made it necessary for federal authorities to "unscramble the polluted eggs after the fact." *Wilmington* v. *United States*, 157 Fed. Cl. 705, 710 (2022). By 1972, it was recognized that this was impractical, yet the EPA maintains that Congress retained the backward-looking approach without making any attempt to address the vexing multiple-discharger problem.

The EPA's only response to this argument is to note that in this case the Oceanside facility is the only entity that discharges into the relevant area of the Pacific Ocean. But the multiple-discharger problem goes to the meaning of § 1311(b)(1)(C), and that provision cannot mean one thing in a single-discharger case and another when there are multiple dischargers.[13]

## IV

Before concluding, we briefly address three additional arguments advanced by the Government.

## A

The EPA maintains that the imposition of end-result limitations is the best course of action when "the information

---

[13] In response to our arguments about the two structural features discussed above, the dissent contends that our interpretation of § 1311(b)(1)(C) is not necessary to protect permittees because even without that interpretation a permittee subjected to an end-result provision could challenge it as arbitrary and capricious. See *post*, at 364–366 (opinion of BARRETT, J.). Of course, that response is no answer to our argument that § 1311(b)(1)(C) does not authorize end-result provisions in the first place. And in any event, it is not clear that individual arbitrary-and-capricious challenges would provide adequate protection. Unless some form of judicial relief could be obtained before an end-result provision took effect, a permittee's potential liability could reach astronomical proportions before the challenge was finally resolved.

necessary to develop additional 'effluent limitations' is un-available."   Brief for Respondent 41.   And it complains that it should not bear the burden of determining what a permittee should do to protect water quality because a permittee is likely to have better access to necessary information and a superior understanding of the operation of its facility and the changes that could be made to provide further protection for water quality.

We are not moved by this argument.   For one thing, it appears that the EPA and state permitting authorities have used end-result requirements routinely, not just when a permit holder has failed to provide necessary information.   See *In re Lowell*, 18 E. A. D. 115, 176 (EAB 2020); App. to Pet. for Cert. 519.   And in any event, the EPA possesses the expertise (which it regularly touts in litigation) and the resources necessary to determine what a permittee should do. It is also armed with ample tools to deal with situations in which a permittee is slow to provide needed information or is otherwise uncooperative.   The EPA can set a schedule for the provision of information and can refuse to issue a permit until the permittee complies.   If necessary, it can make use of its emergency powers.   See 33 U. S. C. § 1364.[14]

## B

The EPA contends that Congress authorized the use of end-result requirements when it codified the Agency's CSO Policy in 1994, see 33 U. S. C. § 1342(q)(1).   And in support of that argument, it cites language in the policy that pertains

---

[14] The dissent argues that end-result provisions are in the best interests of regulated entities because the alternative may be delay in the issuance of permits.   *Post*, at 368 (opinion of BARRETT, J.).   If that were true, one would expect regulated parties to favor such provisions, but none has done so.   On the contrary, a long list of municipalities and other permittees support San Francisco's position.   See *supra*, at 338–339; *infra*, at 355. These sophisticated entities are better positioned than the dissent to judge what is good for them.

to phase I permits. But the permit in question here is a phase II permit, and the EPA does not claim that its interpretation is supported by any CSO Policy provision relating to such permits.[15]

In any event, the phase I language to which the EPA points does not authorize the imposition of end-result requirements. The policy states that a phase I permit should require a permittee to "[c]omply with applicable [water quality standards] expressed in the form of a narrative *limitation.*" 59 Fed. Reg. 18696 (emphasis added). Our decision does not rule out "narrative limitations." "Limitations," as we understand the term, see *supra*, at 346–347, are permitted under § 1311(b)(1)(C), and limitations may be expressed in both numerical and non-numerical (*i.e.*, "narrative") form.

Attempting to read more into the phase I language, the EPA cites guidance it issued in 1995, but Congress did not

Page Proof Pending Publication

[15] In fact, the CSO Control Policy specifies exactly what a phase II permit should contain, and those requirements are inconsistent with the end-result limitation that the EPA imposes here. Under the policy, a phase II should contain: (1) "[r]equirements to implement the technology-based controls"; (2) "[n]arrative requirements which insure [*sic*] that the selected CSO controls are implemented, operated and maintained as described in the long-term CSO control plan"; (3) "[w]ater quality-based effluent limitations . . . requiring, at a minimum, compliance with . . . numeric performance standards for the selected CSO controls"; (4) "[a] requirement to implement, with an established schedule, the approved post-construction water quality assessment program"; (5) "[a] requirement to reassess overflows to sensitive areas in those cases where elimination or relocation of the overflows is not physically possible and economically achievable"; (6) "[c]onditions establishing requirements for maximizing the treatment of wet weather flows"; and (7) "[a] reopener clause authorizing the NPDES authority to reopen and modify the permit upon determination that the CSO controls fail to meet [water quality standards] or protect designated uses." 59 Fed. Reg. 18696. Again, although the purpose is to improve the quality of the relevant bodies of water, these permitting components all relate to the dischargers' behavior and the permitting authority's supervision of that behavior.

codify that guidance, and we are not obligated to accept administrative guidance that conflicts with the statutory language it purports to implement. See *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369 (2024). We also note that other guidance issued by the EPA is arguably inconsistent. See EPA, Combined Sewer Overflows: Guidance for Permit Writers, at A–1 to A–7.

C

Finally, the EPA contends that the rejection of its interpretation of 33 U. S. C. § 1311(b)(1)(C) would have disruptive consequences for businesses that rely on "general permits." Brief for Respondent 38; Tr. of Oral Arg. 83. (General permits cover an entire category of point sources in a given area. See *South Fla. Water Management Dist.* v. *Miccosukee Tribe*, 541 U. S. 95, 108, n. (2004).) Such permits are important for certain businesses, such as home builders, other construction companies, and certain agricultural enterprises, see Brief for National Association of Home Builders et al. as *Amici Curiae* 1, 11, but no such company has submitted a brief supporting the EPA's interpretation. On the contrary, a brief filed on behalf of such companies urges us to reject the EPA's position. *Id.*, at 4–7. What is important, these companies tell us, are narrative limitations other than end-result requirements, and they specifically cite provisions demanding compliance with "best-management practices" and "operational requirements and prohibitions." Our decision allows such requirements.

V

In sum, we hold that § 1311(b)(1)(C) does not authorize the EPA to include "end-result" provisions in NPDES permits. Determining what steps a permittee must take to ensure that water quality standards are met is the EPA's responsibility, and Congress has given it the tools needed to make that determination. If the EPA does what the CWA demands, water quality will not suffer.

\*     \*     \*

The judgment of the Ninth Circuit is reversed.

*It is so ordered.*

JUSTICE BARRETT, with whom JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON join, dissenting in part.

The Environmental Protection Agency issued San Francisco a permit allowing it to discharge pollutants from its combined sewer system into the Pacific Ocean. The permit, of course, does not give the city free rein, and among its conditions are prohibitions on discharges that contribute to a violation of applicable water quality standards. San Francisco challenges these conditions on the ground that EPA lacks statutory authority to impose them. The city is wrong. The relevant provision of the Clean Water Act directs EPA to impose "any more stringent limitation" that is "necessary to meet . . . or required to implement any applicable water quality standard." 33 U. S. C. § 1311(b)(1)(C). Conditions that forbid the city to violate water quality standards are plainly "limitations" on the city's license to discharge.

Notwithstanding the straightforward statutory language, the Court sides with San Francisco. I join Part II of its opinion, which rightly rejects the city's primary argument. In Part III, however, the Court embraces an equally weak theory—that the permit's restrictions are not "limitations," as that word is ordinarily used. The Court's analysis is contrary to the text, so I respectfully dissent in part.

I

A

Under the Clean Water Act, "the discharge of any pollutant by any person" is unlawful except as expressly authorized. 33 U. S. C. § 1311(a). As relevant here, authorization

comes in the form of "National Pollutant Discharge Elimination System (NPDES) permits," which EPA (or, in some circumstances, a State) may issue to allow discharges. Before issuing a permit, however, the Agency must ensure that "such discharge will meet . . . all applicable requirements" under several different statutory provisions. § 1342(a)(1).

Section 1311(b) is one such provision. It works in two steps for permits like San Francisco's. *First*, under § 1311(b)(1)(A), EPA must set "effluent limitations" that "shall require the application of the best practicable control technology currently available." "'[E]ffluent limitation'" refers to a restriction "on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources" into waters subject to EPA's jurisdiction. § 1362(11).

*Second*, under § 1311(b)(1)(C), EPA must impose "any more stringent limitation, including those necessary to meet water quality standards, . . . or required to implement any applicable water quality standard." Water quality standards—which are devised by the States and subject to federal approval—"consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." § 1313(c)(2)(A). Effluent limitations, standing alone, are not always sufficient to protect the desired water quality, as set forth in the water quality standards. So point sources, "'despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels.'" *Arkansas* v. *Oklahoma*, 503 U. S. 91, 101 (1992) (quoting *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 205, n. 12 (1976)). Importantly, the Act does not itself require dischargers to heed water quality standards; the standards are enforceable only insofar as they are incorporated into permit conditions under § 1311(b)(1)(C).

Section 1311(b) therefore sets forth a coherent regime. In the first instance, EPA regulates water pollution through

technology-based effluent limitations that restrict the "quantities, rates, and concentrations" of harmful materials that permittees may discharge. §1362(11). But when the technology-based effluent limitations are insufficient to ensure that the water quality standards are met, EPA has supplemental authority to impose further limitations.

## B

As the Court explains, San Francisco operates a combined sewer system, which transports sewage and stormwater runoff via the same conduits. See *ante*, at 341–343. Such systems occasionally overflow in wet weather—and when they do, they discharge both stormwater and untreated sewage into waters potentially regulated by the Clean Water Act. 59 Fed. Reg. 18689 (1994). As relevant here, "combined sewer overflow" events from one component of San Francisco's sewer system result in the discharge of pollutants into the Pacific Ocean via the Southwest Ocean Outfall, which is located within EPA's jurisdiction, 3.3 nautical miles off the coast of San Francisco. These discharges are presumptively unlawful under §1311(a) and hence require a permit.

The city's NPDES permit contains both the technology-based effluent limitations required by §1311(b)(1)(A) and additional limitations to protect the water quality standards under §1311(b)(1)(C). This latter category includes two "receiving water limitations"—requirements defining the permissible discharge by reference to its effect on the quality of the waters that receive it, rather than by reference to the nature of the discharge itself. (These are what the Court calls "'end-result' requirements." *Ante*, at 338.) The first states that San Francisco "shall not cause or contribute to a violation of any applicable water quality standard." App. to Pet. for Cert. 97. The second provides that "[n]either the treatment nor the discharge of pollutants shall create pollution, contamination, or nuisance" as defined by the California Water Code. *Id.*, at 339.

The city's permit thus tracks the structure of § 1311(b). It restrains discharges initially through technology-based effluent limitations, as required by § 1311(b)(1)(A). But because the effluent limitations may be insufficient to ensure that California's water quality standards are met, the permit contains supplemental limitations, as required by § 1311(b)(1)(C). The concern that the technology-based effluent limitations may fall short is on display in this case—discharges from components of San Francisco's sewer system have allegedly led to serious breaches of the water quality standards, such as "discoloration, scum, and floating material, including toilet paper, in Mission Creek." Complaint in *United States* v. *City and County of San Francisco*, No. 3:24–cv–02594 (ND Cal., May 1, 2024), ECF Doc. 1, p. 22. The receiving water limitations imposed under § 1311(b)(1)(C) are included to ensure that such breaches do not occur.

## II

### A

San Francisco dedicates almost all its briefing to the proposition that the receiving water limitations are unlawful because § 1311(b)(1)(C) allows only effluent limitations. In other words, San Francisco reads the phrase "any more stringent limitation" to mean "any more stringent *effluent* limitation." As the Court explains, this argument is flatly inconsistent with the text of § 1311(b). See *ante*, at 344–345. In my view, the failure of that argument should have ended this case.

The Court continues, however, with a theory largely of its own making. Whatever "any more stringent limitation" may mean, the Court says, it does not authorize EPA to direct permittees to comply with the water quality standards.

This conclusion is puzzling. The entire function of § 1311(b)(1)(C) is to ensure that permitted discharges do not violate state water quality standards. And as discussed above, the provision gives EPA broad authority to achieve

that aim through conditions imposed in NPDES permits. Why would that broad authority not allow EPA to tell permittees that they must not cause or contribute to a violation of the very standards that §1311(b)(1)(C) serves to safeguard?

The answer, according to the Court, is that a restriction does not count as a "limitation" if the permittee must identify the steps necessary to comply with it. *Ante*, at 346. San Francisco's permit only authorizes discharges that do not degrade water quality below the applicable standard. It is up to the city, however, to formulate a plan to achieve that result. The city's plan, the Court asserts, is a "limitation" on its discharges, but the permit condition is not. See *ibid.* As best I can tell, the Court thinks that only the "direct source of restriction or restraint"—apparently, the most specific restriction—counts as a "limitation." *Ibid.*

The Court offers nothing to substantiate this proposition, and it is wrong as a matter of ordinary English. It is commonplace for "limitations" to state "that a particular end result must be achieved and that it is up to the [recipient] to figure out what it should do." *Ibid.* For example, a company could impose spending "limitations" by requiring each branch to spend no more than its allotted budget, while still leaving branch managers flexibility to determine how to allocate those funds. A doctor could impose a "limitation" on a patient's diet by telling the patient that she must lose 20 pounds over the next six months, even if the doctor does not prescribe a specific diet and exercise regimen. And an airline could impose a "limitation" on the weight of checked bags, even though it does not tell passengers what items to pack. "Limitations" can be general as well as specific, and general limitations can call for more specific ones.

In this context, "limitation" is simply a synonym for "[a] restrictive condition." Funk & Wagnalls New Standard Dictionary of the English Language 1437 (1952). And conditions can be stated at many levels of generality—including

in terms of end results. A college may condition a scholarship on the student's maintenance of a minimum GPA. A homeowner may condition payment for a new roof on the contractor's satisfaction of industry standards. An employer may condition job perks on the employee's performance. In each example, the condition is a limitation on a benefit or payment. There are strings attached.

The Court also misconstrues § 1311(b)(1)(C)'s reference to limitations that are "necessary to meet" or "required to implement" the water quality standards. As for the former phrase, "necessary to meet" does not imply anything about the specificity or concreteness of the limitations adopted by EPA. Rather, the limitations on San Francisco's permit are "necessary to meet" the water quality standards because without them, the standards would not bind the city. The limitations thus ensure that San Francisco will "'comply with,'" "'fulfill,'" "'satisfy,'" or "'come into conformity with'" the water quality standards. *Ante*, at 347 (quoting Random House Unabridged Dictionary 1195 (2d ed. 1987)).

Nor does the phrase "required to implement" help the Court. "Implement," the Court says, generally means "'to give practical effect to and ensure of actual fulfillment by concrete measures.'" *Ante*, at 347. That is true but incomplete. The full definition reads: "to carry out: ACCOMPLISH, FULFILL, . . . *esp*: to give practical effect to and ensure of actual fulfillment by concrete measures." Webster's Third New International Dictionary 1134 (1976). So while the word is often used in the sense of taking "concrete measures," such measures are not necessary to satisfy the definition of "implement."

Regardless, the receiving water limitations "implement" the water quality standards in both the broad and narrow senses of the word. They are required to "carry out[,] accomplish, [or] fulfill" the standards: When effluent limitations fall short, discharges from the city's combined sewer system will otherwise degrade water quality below the applicable

standard. *Ibid.* (capitalization altered). And the limitations are "concrete measures," *ibid.*, because they are the means by which EPA "implement[s] any applicable water quality standard," § 1311(b)(1)(C). They give the standards "practical effect" by making them enforceable. *Id.*, at 1134.

There is no getting around it: The receiving water limitations are "limitations." If they are vague or unreasonable, they are vulnerable to challenge on one or both of those grounds. See, *e.g., Natural Resources Defense Council* v. *EPA*, 808 F. 3d 556, 578 (CA2 2015) (invalidating a receiving water limitation as arbitrary and capricious). But even a vague or unreasonable limitation is still a "limitation."

### B

With the text of § 1311(b)(1)(C) against it, the Court tries to marshal support for its approach from the Clean Water Act's history, as well as from what the Court describes as the "broader statutory scheme." *Ante*, at 348–352. Neither helps.

### 1

As for the statutory history: Advancing a specific theory of the congressional intent behind the Clean Water Act, the Court contends that EPA's interpretation would revive the "backward-looking" policy regime that the Act was designed to replace. See *ante*, at 348–349. Before the Act, the United States enforced federal water pollution laws primarily through abatement actions. See 33 U. S. C. § 1160 (1970 ed.). Though the Act abolished this cause of action, the Court claims that receiving water limitations function in essentially the same way. Just as the United States did when it brought abatement suits, EPA would have to " 'work backward from an overpolluted body of water' " to combat water pollution. *Ante*, at 349 (quoting *State Water Resources Control Bd.*, 426 U. S., at 204). Thus, the Court insists, the use of receiving water limitations would "undo" the Act's shift from abatement suits to " 'direct restrictions' on polluters."

*Ante*, at 349 (quoting *State Water Resources Control Bd.*, 426 U. S., at 204).

Of course, no theory of "what Congress plainly sought to achieve," *ante*, at 349, could justify an implausible interpretation of § 1311(b)(1)(C). Here, however, the Court does not even deliver on the claim that its account "plainly" tracks Congress's goal. *Ante*, at 349. Because receiving water limitations do not actually replicate the old abatement regime, the Court's rendition is not the only (much less the most obvious) explanation for the statutory before and after. There is another explanation, and it is one in which receiving water limitations fit right in.

Under the old system, the United States could bring abatement actions only after the pollution had already occurred. See 33 U. S. C. § 1160(c)(5) (1970 ed.). A glaring problem with this approach is that an *ex post* enforcement regime does not adequately deter polluters or prevent pollution. Making matters worse, this regime involved "cumbrous enforcement procedures" that made it next to impossible to bring abatement actions. *State Water Resources Control Bd.*, 426 U. S., at 202; see also 33 U. S. C. § 1160 (1970 ed.) (requiring, prior to an abatement action, that the United States hold a conference of the relevant state agencies, then provide the state agency six months to take remedial action, then call a public hearing with the state agency and the discharger); K. Murchison, Learning From More Than Five-and-a-Half Decades of Federal Water Pollution Control Legislation: Twenty Lessons for the Future, 32 Boston College Env. Aff. L. Rev. 527, 534 (2005) ("According to a report prepared by the Senate Committee on Public Works, the federal government initiated only one enforcement action under the Federal Water Pollution Control Act prior to 1970").

Congress chose a different regulatory model when it adopted the Act in 1972. The Act renders all discharges presumptively unlawful. Then, under the current *ex ante* permitting regime, EPA authorizes only those discharges

that comply with the Act. Should a permittee fail to comply with the terms of its permit, EPA has broad authority to sue. See 33 U. S. C. §§ 1319(b)–(d) (authorizing civil actions for injunctive relief, civil penalties for violations, and in some instances criminal sanctions).

The receiving water limitations imposed under § 1311(b)(1)(C) are entirely consistent with this scheme. Again, the technology-based effluent limitations imposed under § 1311(b)(1)(A) do the primary work of gating discharges at the front end to minimize pollution. The § 1311(b)(1)(C) limitations guard against any residual risk that discharges will violate the water quality standards. Because these limitations supplement rather than replace the technology-based effluent limitations, there is no risk that broadly worded receiving water limitations will recreate the ineffective abatement regime that prevailed prior to 1972.

Furthermore, the receiving water limitations operate within the broader context of the Act's permitting regime. These permits impose a *prospective* requirement on permittees to comply with permit conditions. Under the old regime, a discharger could take an approach of "pollute first and apologize later," secure in the knowledge that an abatement suit was unlikely and that such a suit would at most allow judgment to "secur[e] abatement of any pollution proved." 33 U. S. C. § 1160(h) (1970 ed.). A permittee who violates a permit condition, by contrast, necessarily exposes itself to enforcement actions by EPA, as well as potential penalties. See 33 U. S. C. §§ 1319(b)–(d). Receiving water limitations, like any other permit condition, thus operate as "'direct restrictions' on polluters." *Ante,* at 349 (quoting *State Water Resources Control Bd.*, 426 U. S., at 204).

2

The Court also claims that the receiving water limitations are inconsistent with two features of the "broader statutory scheme." *Ante,* at 350–352. *First,* it contends that the re-

BARRETT, J., dissenting in part

ceiving water limitations are at odds with the permit shield provision because violations of the permit condition (and the attendant liability) are hard to predict. *Ante*, at 350–351. *Second*, it argues that the Clean Water Act is silent about the problem of multiple dischargers into the same body of water—and if the Act allowed EPA to condition a permit on maintaining water quality standards, the Court says, it surely would have spelled out how to deal with such an obvious complication. *Ante*, at 351–352. Both of these arguments boil down to the Court's concern that receiving water limitations might be unfair to permittees. In some circumstances, they might be. But any unfairness should be addressed through arbitrary-and-capricious challenges—not a statutory rewrite.

Start with the permit shield provision. Under § 1342(k), compliance with the terms of a permit "shall be deemed compliance" with various substantive provisions of the Act, thereby shielding permit holders from liability. The Court insists that receiving water limitations like those in the city's permit would "eviscerat[e]" that benefit by failing to provide fair notice. *Ante*, at 350–351.

The permit shield provision, however, serves the specific role of immunizing permittees that *comply* with a permit. See § 1342(k). For instance, it "insulate[s] permit holders from changes in various regulations during the period of a permit" and "relieve[s] them of having to litigate in an enforcement action the question whether their permits are sufficiently strict." *E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S. 112, 138, n. 28 (1977). The receiving water limitations do not eliminate that benefit. It remains true that San Francisco cannot be sued under the theory that the city's permit is insufficient to ensure compliance with the Act.

Really, the Court's argument reduces to the broader policy concern that it may be difficult for regulated entities to comply with receiving water limitations and that they may lack adequate notice of a violation. But again, that concern goes

to the question whether a particular receiving water limitation is rational. If a permittee cannot reasonably determine how to comply with a receiving water limitation, then the permit condition may be invalidated as arbitrary and capricious. (In fact, San Francisco made arbitrary-and-capricious arguments below, but the Ninth Circuit rejected them; the city did not seek this Court's review of that issue. See 75 F. 4th 1074, 1092–1093 (2023).) And as EPA acknowledged at oral argument, the Agency "may not impose limitations of any kind that are unconstitutionally vague." Tr. of Oral Arg. 51. These concerns do not speak to the relevant question here, which is whether receiving water limitations comport with the Act.

The Court is also wrong to suggest that receiving water limitations are categorically impermissible because there may be multiple dischargers into one body of water in some circumstances. See *ante*, at 351–352. It makes little sense to say that an agency *always* lacks authority to take a certain action just because the action would be unreasonable in some scenarios. And as the Court itself recognizes, there is no multiple-discharger problem here: San Francisco is the only significant discharger at the Southwest Ocean Outfall. *Ante*, at 352. If EPA does start imposing receiving water limitations in contexts where permittees cannot control the quality of the receiving waters—such as where there are multiple dischargers—then, again, the permittee can bring an arbitrary-and-capricious challenge.

3

Finally, the Court downplays the valuable uses of receiving water limitations. To begin, EPA imposes such limitations when the Agency "lacks the information necessary to develop more tailored limitations." Tr. of Oral Arg. 51. That is the case here: San Francisco has consistently failed to update its Long-Term Control Plan for managing combined sewer overflows. See 75 F. 4th, at 1095 (observing

that San Francisco has not updated its plan since 1991). By imposing receiving water limitations, EPA was nevertheless able to issue a permit to San Francisco while complying with the Clean Water Act.

The Court does not explain what other course of action EPA could take. Instead, it states, without citation, that "EPA possesses the expertise . . . and the resources necessary to determine what a permittee should do." *Ante*, at 353. This bare assertion simply ignores the obvious problem—how is EPA expected to deploy its expertise when it lacks the basic information necessary to make a decision? The Court also suggests that the Agency could refuse to issue a permit until the applicant provides the necessary information. *Ibid.* But this gives the game away: The entire point of EPA's argument is that it is preferable for EPA to impose broadly worded conditions in its permits than to deny permits altogether and potentially shut down San Francisco's sewer system. Nor can EPA simply "make use of its emergency powers" when permittees fail to provide necessary information. *Ibid.* Such powers are available only when there is "imminent and substantial endangerment to the health of persons or to . . . the livelihood of . . . persons." § 1364(a). As the name "emergency" suggests, these powers provide a limited avenue for the Agency to sue in response to a crisis. They do not provide a solution to the problem of noncompliant permittees.

Receiving water limitations are also useful when EPA issues general permits to broad categories of dischargers (such as for construction projects). See *South Fla. Water Management Dist.* v. *Miccosukee Tribe*, 541 U. S. 95, 108, n. (2004) (observing that such "permits greatly reduce . . . administrative burden by authorizing discharges from a category of point sources within a specified geographic area"). In lieu of individualized and prescriptive permitting conditions— which would take time to craft and with which small businesses might have difficulty complying—EPA instead allows

the permittee to proceed under more general language. EPA can therefore issue the permit quickly and give responsible permittees flexibility to choose how to comply with the permit.

After today, the alternative for entities seeking a general permit is not for EPA to issue the permit without the §1311(b)(1)(C) limitation. Instead, the alternative is for the permit to be delayed or even denied. See Tr. of Oral Arg. 83 (If the Court "take[s] away [EPA's] ability to rely on these sorts of prohibitions," then the Agency is "going to need to ask for more information because it's only with that information" that the Agency can "develop more tailored limitations"). Section 1311(b)(1)(C) is not optional; EPA is required to issue the limitations necessary to ensure that the water quality standards are met. So taking a tool away from EPA may make it harder for the Agency to issue the permits that municipalities and businesses need in order for their discharges to be lawful.

The Court dismisses this concern, noting that "no . . . company has submitted a brief supporting . . . EPA's interpretation." *Ante*, at 355. But there is no reason to think that the sampling of trade associations from which this Court happens to hear reflects the views of all potentially affected parties. And in any event, neither the cited *amicus* brief nor the Court itself has any response to EPA's straightforward point: If the Agency must impose individualized conditions for each permittee under §1311(b)(1)(C), then it will be more difficult and more time consuming for the Agency to issue permits.

*        *        *

Receiving water limitations are not categorically inconsistent with the Clean Water Act. Because the Court holds otherwise, I respectfully dissent in part.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 334, line 1: "1151" is changed to "1251"
p. 335, line 10: "the" is inserted before "EPA"
p. 335, line 12: "the" is inserted before "EPA"
p. 335, line 6 from bottom: "the" is inserted before "EPA"
p. 336, line 29: "and remanded" is deleted
p. 339, line 8: "Boston College" is inserted before "Env."
p. 350, n. 12, line 5: "§ 1311(b)(1)(B)" is replaced with "§ 1311(b)(1)(C)"
p. 363, line 9 from bottom: "Boston College" is inserted before "Env."
p. 363, line 9 from bottom: "L. Rev." is inserted after "Aff."